## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY, TRENTON DIVISION

| | |
|---|---|
| NEW JERSEY SECOND AMENDMENT ) <br> SOCIETY AND MARK CHEESEMAN ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CHRISTOPHER S. PORRINO, in his ) <br> Official Capacity as Acting Attorney ) <br> General of New Jersey, and COLONEL ) <br> RICK FUENTES, in his Official Capacity ) <br> as Superintendent of the New Jersey State ) <br> Police ) <br> ) <br> Defendants. ) <br> _____) | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, New Jersey Second Amendment Society and Mark Cheeseman ("Plaintiffs"), by and through their undersigned counsel, and complain of the Defendants as follows:

### I.   PARTIES

1. Plaintiff New Jersey Second Amendment Society ("NJ2AS") is a civil rights advocacy group dedicated to protection of the Second Amendment. NJ2AS has members across New Jersey that desire less-lethal means to protect themselves.

2. Plaintiff Mark Cheeseman is a natural person and a citizen of the United States and of the State of New Jersey.

1

3. Defendant Christopher S. Porrino is sued in his official capacity as Acting Attorney General of the State of New Jersey and is responsible for enforcing the State's customs, practices and laws related to the State of New Jersey's ban on stun guns.

4. Defendant Colonel Rick Fuentes is sued in his official capacity as Superintendent of the New Jersey State Police. Defendant Fuentes is responsible for enforcing the State's customs, practices and laws related to the State of New Jersey's ban on stun guns.

## II.   JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.   STATEMENT OF FACTS

### a. The Second Amendment

7. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

8. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent

confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. __ (2016),

9. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

10. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

11. Under the Second Amendment, the State of New Jersey retains the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

12. Given the decision in *Heller*, New Jersey may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose

regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 577 U.S. ___ (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

### b. Tasers

13. Tasers are arms in common use for self-defense by civilians as well as by law enforcement.

14. Tasers are manufactured and sold by Taser International, Inc.

15. A Taser is an electronic control device ("ECD") that uses replaceable cartridges containing inert, compressed nitrogen to fire two small probes that are attached to insulated conductive wires. In the models generally marketed to non-law enforcement persons, the conductive wires are 15 feet (4.5 meter) in length.

16. Taser models generally marketed to law enforcement agencies use conductive wires with lengths up to 25 feet in length.

17. The probes are designed to penetrate the clothing of an attacker and imbed in the attacker's skin. Electrical energy is sent over the wires into the probes. The charge is transmitted between the two probes and is designed to disrupt the sensory and motor functions to inhibit muscular control of an attacker.

18. With a Taser exposure, the attacker is momentarily incapacitated to allow the person attacked to escape and call for law enforcement assistance, or in

the case of a law enforcement officer, to allow for the apprehension of the suspect without further risk of injury to the officer or the suspect.

19. The Taser's electronic charge lasts from five to thirty seconds depending on whether the civilian or the law enforcement model is employed.

20. The most commonly employed civilian Taser is a one shot device with a 30 second charge. Once fired the device can still be used as a direct contact stun device in the event of a missed shot or in the event of multiple assailants.

21. Taser International also manufactures Taser devices having the capacity for multiple shots. These multiple shot devices are commonly used by law enforcement personnel in the performance of their duties.

22. Tasers have several advantages over other non-lethal means of self-defense, such as self-defense sprays or contact weapons.

23. First, self-defense sprays must be administered generally within several feet of an assailant while a civilian model Taser can be deployed within 15 feet. The closer distance the assailant must be to a potential victim for the victim to employ a self-defense spray increases the danger to the potential victim. For example, it is generally recognized by law enforcement that an assailant wielding a contact weapon such as a knife or a club can be a lethal threat at distances of 21 feet or closer. *See* Dennis Tueller, *How Close is Too Close*, Police Policies Study Council,

available at http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (originally published in the March 1983 Edition of SWAT Magazine).

24. Secondly, pepper sprays can often be ineffectual against highly intoxicated or highly agitated assailants. *See generally* Steven M. Edwards, et al., *Evaluation of Pepper Spray*, National Institute of Justice, U.S. Dept. of Justice, Office of Justice Programs, Research in Brief (February 1997), available at https://www.ncjrs.gov/txtfiles/162358.txt. Tasers, on the other hand, when effectively employed will likely stop an attack from an intoxicated or mentally disturbed attacker.

25. Thirdly, for optimum effect, defence sprays should be deployed at the face of the attacker, which is a small target. The Taser is most effective when deployed at other larger parts of the body of the attacker.

26. Fourth, defence sprays can end up being blown back at the victim if used in a windy environment, resulting in incapacitating the victim rather than the attacker. This is not an issue with a Taser device.

27. Likewise, Tasers have advantages over the variety of contact weapons as well such as police type batons or knives. Allowing an attacker to close to contact distance creates a high degree of danger to a potential victim.

28. Contact weapons can also be more difficult for persons of lesser strength to deploy, compared to a Taser.

29. Moreover, use of any contact weapon, such as a knife or club, carries a high degree of risk of death or serious bodily harm to the assailant, whereas risk of death or serious bodily harm from a Taser is minimal.

30. On a related note, given that use of a knife or club qualifies as the use of deadly force, an individual using a knife or club to defend against a criminal attack, has a high legal standard to meet to sustain a claim self-defense.[1]

31. Tasers have been widely used by law enforcement agencies throughout the United States and the world. More than 18,000 law enforcement agencies use the devices.

32. Studies have shown Tasers to reduce injuries to both law enforcement officers and to suspects. The United States Department of Justice found that Tasers result in fewer injuries to suspects and officers than all other means of subduing suspects.

33. In the event of deployment of a civilian Taser the device releases some twenty-four (24) small confetti-like tags called AFIDs which are packed into the firing mechanism. When the Taser cartridge is engaged, the AFIDs fly out of the Taser and scatter around the area where the device was utilized.

---

[1] "Before resorting to deadly force, one must have both an objectively reasonable and an honest—that is, sincere—belief 'in the need to kill in self-defense.'" *State v. Rodriguez*, 949 A.2d 197, 201 (N.J. 2008) (citation omitted).

34. The term AFID stands for Anti Felon Identification. Taser utilizes AFIDs to deter criminal misuse of its product. Taser can trace the purchaser of the device from data contained on an AFID.

35. Tasers and other electronic weapons are in common use for self-defense. The Michigan Court of Appeals found that "Hundreds of thousands of Tasers and stun guns have been sold to private citizens," *People v. Yanna*, 297 Mich. App. 137, 144, 824 N.W. 2d 241, 245 (2012). Concurring in the *per curiam* reversal of the Massachusetts Supreme Judicial Court's upholding of a ban on stun guns, Justice Alito stated, "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano v. Massachusetts*, 577 U.S. __, ___ (March 21, 2016) (Alito, J., concurring).

   c. **New Jersey Law**

36. N.J. Stat. Ann. § 2C:39-1 defines "Stun gun" to mean "any weapon or other device which emits an electrical charge or current intended to temporarily or permanently disable a person." This same statute includes stun gun in the definition of a "weapon."

37. N.J. Stat. Ann. § 2C:39-3(h) provides that "[a]ny person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree."

38. Thus, New Jersey outlaws the private possession by Plaintiffs of a Taser or stun gun within the state

39. A first violation of New Jersey's complete ban on the ownership or possession of Tasers or stun devices by non-law enforcement personnel is punishable as follows: "[i]n the case of a crime of the fourth degree, for a specific term which shall be fixed by the court and shall not exceed 18 months." N.J. Stat. Ann. § 2C:43-6. A fine may also be levied "not to exceed … $10,000.00." N.J. Stat. Ann. § 2C:43-3(b)(2).

### d. Plaintiff New Jersey Second Amendment Society

40. Plaintiff New Jersey Second Amendment Society ("NJ2AS") is a membership driven group that seeks to protect Second Amendment rights. See Exhibit "A."

41. NJ2AS's members who are legal residents of New Jersey include law-abiding adults who desire to own stun guns or Tasers for self-defense and other lawful purposes.

42. But for New Jersey's complete ban on stun guns and Tasers, some of NJ2AS's members would purchase and keep a stun gun or Taser in their home for self-defense and other lawful purposes.

43. New Jersey's ban on stun guns and Tasers infringes on the Second Amendment rights of NJ2AS members.

44. NJ2AS brings this action on behalf of those members.

### e. Plaintiff Mark Cheeseman

45. Plaintiff Mark Cheeseman desires to purchase a stun gun or Taser for self-defense and other lawful purposes in his home.

46. Mr. Cheeseman is aware that there are significant and adverse legal, financial, social and psychological ramifications of using deadly force to defend against a home invasion or personal attack. He is aware that even where use of deadly force is justified, a victim forced to use deadly force may be taken into police custody, arrested and prosecuted. He is aware that he would likely have to go to the expense of hiring an attorney to protect his rights in the criminal justice system. He is aware that he would be at the mercy of police, prosecutors and jurors who will have weeks or months to second guess a decision to use deadly force made in seconds in the face of a threatened attack.

47. Mr. Cheeseman is aware that even where use of deadly force is justified, a victim may be sued by the perpetrator if the perpetrator survives, or by the perpetrator's family, if the perpetrator does not survive. The victim may have to go to the expense of hiring an attorney to defend the civil proceeding and will be at the mercy of a jury second guessing in the comfort of a jury room the decision to use deadly force made in a seconds in the face of an attack.

48. Mr. Cheeseman is aware that persons forced to use deadly force in their defense will likely suffer one or more types of psychological distress. *See generally,* Alexis Artwolh, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gun Fight* (1997), pp. 79-242 (hereinafter "Artwohl").

49. He is aware that persons forced to use deadly force in their defense will likely suffer from the withdrawal and isolation of friends and families, especially if their use of force results in the death of the perpetrator.

50. He is aware that persons forced to use deadly force in their defense will likely suffer from one or more manifestations of Post Violent Event Trauma ("PVET"). Manifestations of PVET can include sleep disturbance including sleeplessly or nightmares, sexual dysfunction or promiscuity, substance abuse, depression or malaise, appetite disturbance, social withdrawal or social ostracism, aggression or avoidance syndrome and flashbacks. *See* Artwohl.

51. Mr. Cheeseman is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend himself or his home against a violent criminal attack.

52. Mr. Cheeseman would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

53. In appropriate circumstances, Mr. Cheeseman would prefer to utilize a Taser for defense of himself, his family and his home due to its proven effectiveness and its proven record of minimizing injury to suspects and/or assailants.

54. Mr. Cheeseman on August 10, 2016, sought to place an order with Taser International for a Taser Pulse model. In response, Taser declined the purchase, stating that "The sale of TASER devices is prohibited at this location…" i.e, New Jersey bans Tasers. See Exhibit "B."

55. But for New Jersey law, Mr. Cheeseman would acquire, possess, carry and where appropriate use a Taser device to protect himself, his family and his home.

## COUNT I

**U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS**

56. N.J. Stat. Ann. § 2C:39-3(h) prohibits plaintiffs from acquiring, possessing and using a defensive arm in common use, i.e., a Taser. As such it violates plaintiffs' Second Amendment rights.

57. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing N.J. Stat. Ann. § 2C:39-3(h) to ban the acquisition, possession, carrying or use of Tasers and other electronic arms;

2. An order declaring that N.J. Stat. Ann. § 2C:39-3(h) is unconstitutional and violates the Second Amendment to the United States Constitution;

3. An order declaring N.J. Stat. Ann. § 2C:39-3(h) unenforceable;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

5. Such other Declaratory relief consistent with the injunction as appropriate; and

6. Such other further relief as the Court deems just and appropriate.

Respectfully submitted,

NEW JERSEY SECOND AMENDMENT SOCIETY AND
MARK CHEESEMAN

*/s/ Ryan S. Watson*
Ryan S. Watson
Law Offices of J. Scott Watson, P.C.
24 Regency Plaza
Glen Mills, PA 19342

(610) 358-9600
NJ Bar No. 089642013
ryan.watson@jscottwatson.com

| | |
|---|---|
| Stephen D. Stamboulieh | Alan Alexander Beck |
| Stamboulieh Law, PLLC | Law Office of Alan Beck |
| P.O. Box 4008 | 4780 Governor Drive |
| Madison, MS  39130 | San Diego, CA  92122 |
| (601) 852-3440 | (619) 905-9105 |
| stephen@sdslaw.us | Alan.alexander.beck@gmail.com |
| MS Bar No. 102784 | *Pending Admission Pro Hac Vice |
| *Pending Admission Pro Hac Vice | |